**STACKER & RAVICH, Respondent,**

v.

**Ronald L. SIMON, Appellant,**

**Glenn R. Ayres, et al.,
Counterclaim Defendants.**

**No. CO–86–2036.**

Court of Appeals of Minnesota.

Aug. 25, 1987.

Review Denied Nov. 13, 1987.

Jerry W. Snider, Joseph H. Otterstetter, Faegre & Benson, Minneapolis, for respondent.

Jerome B. Simon, Maun, Green, Hayes, Simon, Johanneson and Brehl, St. Paul, for appellant.

Heard, considered and decided by HUSPENI, P.J., and WOZNIAK and CRIPPEN, JJ.

## OPINION

HUSPENI, Judge.

This action was commenced following appellant Ronald Simon's withdrawal from the Stacker, Ravich and Simon law partnership, which continued in business as the Stacker and Ravich partnership. There was no written partnership agreement. Therefore, the trial court was called upon to resolve several matters relating to the financial consequences of the withdrawal. Simon asserts that the trial court's allocation of fees from two clients and imposition of a sanction should be reversed and that interest awarded on his capital account should be increased. Respondent, the Stacker and Ravich partnership, has filed a notice of review and argues that the court erred in allocating fees on unfinished business completed by Simon, in calculating the amount of Simon's capital account and awarding interest, in requiring indemnification of Simon in regard to litigation by a former partner, in imposing sanctions under Minn.Stat. § 549.21, in allocating fees from one client, and in denying a jury trial. We affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

## FACTS

On August 1, 1980, appellant Simon joined the Stacker and Ravich law firm, creating a partnership known as Stacker, Ravich and Simon (SR-1). It was agreed that the amount of his capital account upon entering the partnership was $300,000. Although the parties prepared an informal letter agreement, no partnership agreement was ever formalized. Several attempts were made to negotiate an agreement covering such items as determination of the amount of capital accounts upon withdrawal of a partner. The parties were unable to reach agreement.

SR-1 did agree that the firm would purchase life insurance to provide compensation for the capital account upon the death of any of the partners. For this purpose only, the amount of the original capital accounts was increased ten percent a year. Compensation for the partners was determined annually by a compensation committee. In 1983, Simon received 10.97 percent of the partnership's profit as his compensation.

On October 3, 1983, Simon announced he had withdrawn from the partnership, effective September 30, 1983. The firm operated on a September 30 fiscal year and issued year-end distributions on that date. Simon timed his announcement so as not to interfere with this distribution and to allow time for his distribution check to clear his bank. The remaining partners continued the partnership under the name of Stacker and Ravich (SR-2). During the month of October 1983, Simon worked out of the offices of SR-2. He subsequently established his own practice.

Simon and representatives of SR-2 agreed that clients would be allowed to decide whether unfinished business should be completed by Simon or by SR-2. Letters were sent to clients asking them to indicate their decision. Simon indicated that he would "make book" with SR-2 for fees which he collected from clients electing to have him complete work on their cases.

The parties could not agree on the amount of Simon's capital account. He contended his $300,000 original account should be increased ten percent per year, amounting to $405,955 upon withdrawal. SR-2, however, asserted that there was no agreement indicating that the original account would be increased for the purposes of determining an amount upon withdrawal. SR-2 stated at trial that Simon was due no more than $300,000. While the dispute over the capital account continued, Simon collected fees from clients for work he completed. He did not forward portions of the fees to SR-2.

This action was commenced to resolve several financial disagreements. SR-2's request for a jury trial was denied. Following a lengthy trial to the court in No-

vember and December of 1985, the court issued its findings in April of 1986. The findings were twice amended before judgment was entered on November 28, 1986.

## ISSUES

1. Did the trial court err in apportioning contingent fees between Simon and SR–2 on the basis of the relative time charges of SR–1 prior to Simon's withdrawal and of Simon thereafter?

2. Are the court's findings regarding the P.M. fee supported by the evidence, and did the court err in its allocation of the fee?

3. Are the court's findings of fact regarding the M.N. fee supported by the evidence, and did the court err in its allocation of the fee?

4. Did the court abuse its discretion in imposing sanctions on the parties?

5. Are the court's findings and conclusions relating to Simon's capital account clearly erroneous?

6. Did the court err in determining that Simon was entitled to interest on his capital account and in calculating the amount of interest?

7. Did the court err in requiring SR–2 to indemnify Simon for his potential liability in an action commenced against SR–1 by a former partner prior to Simon's withdrawal?

## ANALYSIS

### I.

The trial court found:

Upon * * * Simon's withdrawal, he and SR–2 agreed to poll a group of clients with work in progress to determine which clients desired to remain with SR–2 and which desired to go with * * * Simon. The clients responded and the division was made amicably.

Based on this finding, the court concluded:

The parties agreed that * * * Simon would do the future work for the clients who adhered to him. They thus negated any claim that the files were the property of SR–2 with * * * Simon to be paid

only an hourly fee. Fees therefore should be divided according to the percentage of work done by [SR–1] and the percentage by * * * Simon. Punitive damages * * * not being appropriate, there is no logic which would permit a division of the percent fees on any other basis.

SR–2 contends that the trial court erred in not considering the cases pending at the time of Simon's withdrawal as assets of the partnership and in failing to consider Simon's fiduciary duties with respect to the unfinished partnership business. We find no error. SR–2 seeks to apply the Uniform Partnership Act (UPA), Minn.Stat. § 323.01 (1984) to reach the conclusion that Simon was entitled to either 10.97 percent of the profits (his compensation rate for 1983) from the fees, or the reasonable value of work he performed after his withdrawal.

SR–2's UPA analysis relies on Minn.Stat. § 323.07 for the proposition that the pending cases are partnership assets. That section states:

All property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership, is partnership property.

Unless the contrary intention appears, property acquired with partnership funds is partnership property.

The second paragraph of the section clearly allows the parties to agree to a different result. In this case, the trial court correctly concluded that the parties agreed that the files would not be treated as partnership assets following Simon's withdrawal. In effect, the parties agreed to transfer to Simon the cases of those clients wishing to have Simon complete the work.

The agreement between the parties recognizes that some compensation was due to SR–2, but it does not outline the amount due. Because the parties agreed that the pending cases were not to be treated as assets of the partnership, the trial court correctly inferred that the fees should be allocated on the basis of the time spent on each case by the partnership and by Simon.

## II.

■ The trial court found:

* * * Simon had agreed with various of the athlete clients to do personal legal and financial work without additional fees. The fee however was calculated as a percentage of salary and thus was fully liquidated and earned at the signing of the athlete's employment contract. In any event, the burden of proof however was not sustained as to the value of such work, past or prospective.

P.M.[1] was one of the athletes contracting with SR–1. Simon, while a partner in SR–1, negotiated a contract for the client with a team, calling for a salary of $5.5 million to be paid over five years. The legal fees were to be five percent of P.M.'s annual salary, billed in December of each year. The firm did legal work each year in addition to negotiating the contract, but did not bill additionally for this work. In a chart allocating fees and costs between Simon and SR–2, the court found that in 1983, 74 percent of the work for the client was done prior to Simon's withdrawal. The court used this 74 percent figure to allocate the fee for 1983, the first year of the five-year contract, and for the additional years. Both parties challenge the allocation, and both request 100 percent of the fee.

The trial court's finding indicates that the fee for athlete clients was calculated as a percentage of salary and "thus was fully liquidated and earned at the signing" of the contract. However, the court also found that additional work was performed without additional fees. In this case, the court allocated 74 percent of the annual fees to SR–2, and 26 percent to Simon. The court's treatment of the matter was proper. It recognized that Simon performed additional work which was expected by the client and which was anticipated in the fee set at five percent of the client's annual salary. The court further recognized that additional work was to be required each

year, although there was to be no additional billing beyond five percent of the salary.

The trial court's approach was also practical. It reflects the fact that the key portion of the work, negotiating the contract, had been performed in 1983 prior to Simon's withdrawal, but that additional work was also required. Furthermore, it is consistent with the parties' agreement that Simon should be compensated for work he completed after his withdrawal. The parties were unable to reach agreement on this issue and it was submitted to the court. The court's determinations were sound.

## III.

■ Regarding the fee in another case, the trial court found:

[M.N.], a client of [SR–1] who elected to go with * * * Simon, had suffered a grievous injury as a result of a motorcycle collision. In the spring of 1983, * * * Simon was aware that the insurance company would pay the face of the policy, $925,000. * * * Simon however did little in the matter until after his withdrawal. During the next three months, he devised a structured settlement to pay [M.N.] potentially more than a million and a half dollars plus attorneys fee of $312,394. * * * Simon's explanation for the delay was that he wanted to include all of the injuries which might develop, which was patently specious when no additional funds were available to pay for any additional injuries. Had the matter been settled prior to * * * Simon's withdrawal, he would have received 10.97% of the initial fee payment of $42,194, or $4,629, and is entitled to credit for his costs of $2,306.

Simon contends that the court's findings regarding the M.N.[2] fee are not supported by the evidence. We disagree. There is evidence in the record, primarily contained in letters from Simon's secretary, which indicates that during the summer of 1983

1. One of the unfortunate consequences of litigation such as this is that details of a client's relationship with his or her attorneys becomes the subject of public proceedings.

2. The observations noted in footnote 1 also apply here.

Simon had intentionally delayed working on pending cases. There is also evidence that during that time Simon had substantially decreased the number of hours he worked. It was during the summer of 1983 that he decided to withdraw from the law firm. As the trial court found, "*by* August 30, 1983 * * * Simon had decided to withdraw." (Emphasis added.)

Given the nature of M.N.'s injuries and the limits of insurance coverage, an attorney of Simon's experience could be expected to determine that the policy limits would be paid without the necessity of waiting to determine if further injuries developed over the next year. In representing the client's interests, the attorney could have taken the initiative to pursue an expeditious resolution of the matter. In contrast, Simon did not demand the policy limits until July 22, 1983, shortly before he left on a trip to Europe. He returned in mid-August, but had little substantive contact with the insurer until days before he formally announced the decision previously made to withdraw from the partnership.

We conclude that the evidence supports the trial court's finding. We further conclude that the trial court did not err in allocating all of the fee from this case to SR–2.

## IV.

### A. Sanction against Simon

■ Based on its finding regarding the [M.N.] fee, the court concluded:

The appropriate sanction for [Simon's] intentional dilatoriness is ten percent of the fee, $31,239.

Simon argues that the court abused its discretion in imposing this sanction. Because we have concluded that there is evidence in the record indicating intentional dilatoriness, we will not upset the imposition of the sanction.

### B. Sanction against SR–2

■ The court found:

In pleading and presenting their case, [SR–2] acted in bad faith and caused unnecessary preparation and rebuttal by * * * Simon by (a) propounding and in-

sisting on a [H.] claim $15,000 too high when the true amount could reasonably have been known and was in fact shown to them by * * * Simon; (b) failing to include a monthly financial statement for September 198[4] because it would substantially offset a bleak picture for the first eleven months of that fiscal year and then, in Court, claiming that a successful and highly computerized business law firm was unable to find the statement. * * * Simon was prejudiced thereby in the amount of $10,000.

The court imposed a $10,000 sanction against SR–2 because of prejudice resulting to Simon from SR–2's bad faith.

Regarding the claim for fees in the H. case, SR–2 acknowledges that its records indicated a fee due that was $15,000 less than the fee shown on Simon's records. Rather than relying on its records or attempting to correct Simon's records, SR–2 increased the amount due as shown on its records. SR–2 contends that its records were often inaccurate, so it accepted Simon's figure. The court, however, found that the firm acted in bad faith when it changed the figure. Minn.R.Civ.P. 52.01 requires that this court give due respect for the trial court's opportunity to evaluate the credibility of witnesses. The trial court was clearly in the best position to determine whether SR–2's explanation was credible. The trial court determined that it was not credible. We will not reverse that determination.

SR–2 argues that it searched diligently for the September financial statement which it claims had been misplaced during the process of moving offices and was not found until after the trial had begun. SR–2 also asserts that sufficient information was in the record to generate the numbers contained in the monthly statement if that statement had not been supplied. We conclude that even if the numbers themselves were available, additional time would have been needed to extract the information that would have been included on the report. When SR–2 realized the report was missing, it could have made the necessary calculations itself. It did not.

Again, the trial court was in the best position to determine credibility. Once again, the trial court found a lack of credibility and also found bad faith. We will upset neither the court's findings nor its imposition of a sanction.

## V.

■ The trial court made several findings regarding Simon's capital account. The court traced Simon's entry into the SR-1 partnership when the parties agreed to value his capital account at $300,000, 19.34% of the total capital accounts.

In its conclusions, the court considered various alternatives for calculating the amount of the capital account:

The simplest formula would be to treat equally all partners whose compensation was on a percentile basis and apportion to each an equal share of the partnership assets at the date of withdrawal, or one twelfth of $2,172,712 plus the [M.N.] fee. But the partners obviously did not consider themselves equal on any basis.

Another formula would be to apportion the assets in the same ratio as they provided for withdrawals by reason of death: initial capital account plus 10% per year, $402,875 for * * * Simon. But the withdrawal-by-death provision was agreed upon solely because it could be funded by life insurance and thus need have no relationship to the actual assets of the partnership which only coincidentally increase by 10% each year.

Another formula would allow * * * Simon the same percentage of total assets as his basic $300,000 Capital Account bore to all of the Capital Accounts, 19.34% of $2,172,712 or $420,203. But * * * Simon concedes that his Capital Account was not more than $405,955.

The distribution could also be by the same percentages as the twelve partners whose annual compensation was based on percentages of profit, * * * Simon's being 10.97% which would produce $238,-347. Pro-rating these percentages among the eight partners who were acknowledged to be the only ones with interests in the capital assets would raise * * * Simon's share to 13.73% which would produce $298,313. But [SR-2] concedes that * * * Simon's Capital Account was at least $300,000; and there was never a discussion of this method.

The history of the partnership shows no pattern in settling withdrawing partners' Capital Account; all of those who did withdraw were individually negotiated, unlikely in the instant case because of the animosity between the parties.

The only formula for which there is evidence of any agreement among the parties is the apportioning of the total Capital Account in the same percentages as the individual Capital Accounts * * * Simon is thus allowed $420,203, without interest, the amount being unliquidated.

SR-2 argues that because the trial court found there was no agreement to increase capital accounts for purposes other than death or disability, the account could be valued at no more than the original $300,-000.

While the court found that there was no agreement on a method for valuing the capital account upon withdrawal of a partner, it did find an agreement on the valuation of Simon's original capital account and the proportion of that amount to the total capital accounts. The original amount of the capital accounts did establish the financial relationship among the partners. The parties failed to reach an agreement which very probably would have obviated the necessity for litigation of this issue and of all the issues here present. The trial court was called upon to do that which the parties failed to do for themselves.[3] The trial court did not err in valuing Simon's capital

---

3. Immediately preceding its recitation of the various formulae by which the capital account valuation might be established, the trial court observed:

The single, overwhelming fact of this entire case is the total lack of a partnership agreement, and this by intelligent lawyers many of whom earn substantial incomes specializing in negotiating complex business arrangements for others. Even a simple agreement would have made unnecessary this whole expensive litigation which has cost the taxpayers alone thus far some $25,000.00.

account upon his withdrawal from the partnership.

A final issue must be addressed in regard to the capital account valuation. Simon asserts that if this court affirms the trial court's allocation of fees in the P.M. and M.N. cases, Simon's capital account should also be increased to reflect his share of the value of the law firm. He contends his capital account was calculated without including these fees in the value of the firm. We are unable to determine upon the record before us whether the trial court included those fees as allocated to SR–2. Upon remand, we request that the trial court make additional findings to indicate whether under its method for calculating the value of the capital account, the P.M. and M.N. fees were, or should have been, included. If based upon the expanded facts the trial court deems modification of the capital account valuation necessary, it shall so modify.

### VI.

██ Simon asserts that the trial court correctly allowed interest on the capital account from October 1, 1983, under Minn. Stat. § 323.41. SR–2 argues that the section applies only when the partnership business is continued following the death or retirement of a partner. Because Simon withdrew rather than retired, SR–2 would read the statute to prohibit the award of interest. We cannot agree with such a reading.

In *Lundstrom v. Navickas*, 295 N.W.2d 626 (Minn.1980), the supreme court applied section 323.41 in a case where a partner had withdrawn, as opposed to retiring or dying. The court stated:

> In the case of interest [Section 323.41] provides that a retiring partner shall receive the value of his share as of the date of dissolution with interest unless otherwise agreed.

*Id.* at 628. Therefore, it was appropriate for the court to award interest on the capital account from the date of Simon's withdrawal, which had the effect of dissolving the partnership under the UPA.

██ In determining the amount of interest due Simon, the court deducted interest due to SR–2 on fees Simon had collected but had not forwarded to SR–2. The trial court's decision to allow interest on the fees is in accord with its determination that the parties had an agreement regarding contingent fees collected by Simon following his withdrawal. Under the agreement, the parties could have determined the amount of fees due to SR–2 prior to entry of judgment. Prejudgment interest can be allowed on unliquidated claims that are readily ascertainable by computation. *Noble v. C.E.D.O., Inc.*, 374 N.W.2d 734, 743 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Nov. 18, 1985).

The trial court treated the fees as if they had all been collected by Simon on October 1, 1983, noting that the evidence was unclear as to the actual dates of collections. However, our review of the record reveals an exhibit[4] which does indicate the actual dates of collections ranging from December 22, 1983 to September 6, 1985. As a result, the evidence does not support the court's finding, and the court erred in calculating interest as if the fees had all been collected on October 1, 1983. However, there is no finding which accepts or rejects the dates contained in exhibit 81. Therefore, the award of interest to SR–2 is reversed and remanded for findings on the dates of the collections and for recalculation of interest based on the dates found by the trial court.

### VII.

██ Prior to Simon's withdrawal, a partner was expelled from the SR–1 partnership for what was deemed to be unethical conduct. The former partner has commenced an action based on his expulsion. The trial court found:

> This litigation being to settle the respective claims of the parties and to terminate their relationship so far as possible, * * * Simon's potential exposure to the * * * claim should be indemnified.

4. Exhibit No. 81.

The court required SR–2 to indemnify Simon for "any claims, expenses of litigation, and any judgments" arising out of the former partner's withdrawal.

As is the case with many of the issues in this matter, there was no agreement between the parties with regard to indemnification, nor does the trial court purport to base its conclusion on any such agreement. Rather, the conclusion is based on a finding which indicates that the court is attempting to end the relationship between the parties. That attempt is understandable and commendable. However, the UPA applies where there is no contrary agreement among the parties. Under Minn.Stat. § 323.35:

> The dissolution of the partnership does not of itself discharge the existing liability of any partner.

Simon, like the other partners, had an existing contingent liability for the claim by the former partner at the date of Simon's withdrawal. Under section 323.35, the dissolution did not discharge that existing liability. In the absence of an agreement between the parties, the court was without authority to discharge Simon's liability by ordering indemnification. Accordingly, that portion of the judgment is reversed.

Finally, we have affirmed the allocation of fees in both the P.M. and M.N. matters. Because the jury trial issue was raised only in the event of a reversal on those allocations, we need not address SR–2's claim that it had a right to a jury trial.

## DECISION

We affirm the trial court's apportionment of contingent fees, including the P.M. and M.N. fees, the imposition of sanctions, and the method by which the amount of Simon's capital account was determined and the award of interest on that account. We request additional findings regarding inclusion of certain client fees in valuation of Simon's capital account, and authorize modification of that valuation, if appropriate. We reverse and remand the calculation of interest due SR–2 on contingent fees collected and retained by Simon, and we reverse the portion of the judgment ordering indemnification of Simon.

Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.