518 N.W.2d 616 (1994)
In re L-TRYPTOPHAN CASES.
William BONNER, et al., Plaintiffs,
Robins, Kaplan, Miller & Ciresi, Appellant,
Brosnahan, Joseph, Lockhart & Suggs, Respondent,
v.
SHOWA DENKO, K.K., a Japanese corporation, et al., Respondents.
No. C3-93-2003.
Court of Appeals of Minnesota.
June 21, 1994.
*617 Eric J. Magnuson, Rider, Bennett, Egan & Arundel, Minneapolis, Geoffrey P. Jarpe, Maun & Simon, St. Paul, for appellant Robins, Kaplan, Miller & Ciresi.
Richard D. Holper, Ralph Mitchell, Jr., Holper, Welsh, Mitchell & Andersen, Minneapolis, *618 for Brosnahan, Joseph, Lockhart & Suggs.
Considered and decided by AMUNDSON, P.J., and CRIPPEN and FORSBERG, JJ.

OPINION
AMUNDSON, Judge.
Following the departure of attorneys from its law firm who subsequently obtained a contingency fee, appellant Robins, Kaplan, Miller & Ciresi argues the district court erred in limiting its attorney fees to an amount based on their attorneys' actual time and hourly rate plus actual expenses. We reverse and remand.

FACTS
In 1989, appellant Robins, Kaplan, Miller & Ciresi (RKMC) began representing individuals injured by the dietary supplement L-tryptophan. By 1993, RKMC was counsel for 44 L-tryptophan plaintiffs. RKMC claims it invested more than $2.7 million in attorney and legal assistant time and incurred more than $750,000 in costs during its representation of L-tryptophan plaintiffs.
The Dakota County District Court divided the cases into four "waves" for mediation and trial. The first wave of cases was mediated in 1992 and the cases settled.
Roger Brosnahan, Jane Joseph, Kristin Lockhart and David Suggs worked for RKMC and were responsible for handling the L-tryptophan cases. On February 26, 1993, Roger Brosnahan, Jane Joseph and David Suggs resigned from RKMC.[1] Kristin Lockhart resigned the next day. The four formed the firm of Brosnahan, Joseph, Lockhart & Suggs (BJLS  respondent in this case) and solicited 25 of the 44 plaintiffs away from RKMC. BJLS has settled some of the cases it took from RKMC. Each settlement includes a confidentiality provision preventing disclosure of the recovery to RKMC or anyone else.
RKMC filed attorneys' liens in the L-tryptophan cases solicited by BJLS. RKMC later moved for an order requiring BJLS to deposit one-third of the settlement proceeds and costs of three cases and to disclose the settlement proceeds of other cases so that RKMC could determine the one-third contingent fee. RKMC also moved for a scheduling order setting a date for summary proceedings and allowing discovery up to the date of the summary proceeding. Two days before the scheduled hearing, counsel for BJLS served a motion requesting an order declaring that the proper measure of RKMC's liens was the reasonable value of services provided by RKMC, as measured by RKMC's actual time and expenses. BJLS also requested that the court prohibit discovery of the amount of the settlements.
On May 7, 1993, the court ordered Dorsey & Whitney, counsel for the L-tryptophan defendants, to set aside costs and attorney fees and hold the funds until further order of the court. The court's May 18, 1993 order provided that the determination of RKMC's attorneys' liens "shall be the reasonable value of the services rendered by RKM & C to plaintiffs prior to being discharged by plaintiffs as measured by RKM & C's actual time and expense in each of these matters." This order was later stayed by the court.
RKMC moved for reconsideration of the May 18th order and also served a complaint in intervention, seeking relief against BJLS for breach of fiduciary duty, unjust enrichment and other claims. RKMC also filed a separate action against BJLS for breach of fiduciary duty, tortious interference with contract and other claims. These actions, however, are not relevant to the merits of this appeal.
On October 7, 1993, the court issued its Order and Order for Judgment and Partial Judgment, denying RKMC's motion for reconsideration and awarding RKMC a judgment of $1,418,632.68 for its reasonable attorney fees and costs. The court required the *619 parties to maintain the confidentiality of the terms and amounts of the settlement agreements. This order has been stayed on the condition that RKMC post a bond or irrevocable letter of credit.
RKMC has appealed and BJLS has filed a notice of review, seeking review of several issues if this court reverses any aspect of the district court's decision.
In a special term order, this court denied BJLS's motion to dismiss and has construed the appeal to be taken from a final order and judgment in a special proceeding. BJLS's second motion to dismiss was also denied.

ISSUE
Did the district court err by limiting appellant's attorney fees to an amount based on their attorneys' actual time and hourly rate plus actual expenses?

ANALYSIS
BJLS argues that the determination of the reasonable value of attorney fees is a question of fact and thus the district court's findings as to the reasonableness of RKMC's attorney fees must be upheld unless clearly erroneous. Since, however, the question on appeal in this case is the legal standard to apply to calculate RKMC's attorney fees, our review is de novo. See Frost-Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n, 358 N.W.2d 639, 642 (Minn.1984) (appellate court need not defer to a district court's determination of a purely legal question).

I. Amount of Attorney Fees

In this case we are asked to decide the proper allocation of attorney fees between two law firms in a contingency fee case, in which: (1) attorneys who have performed the majority of the work on a certain case while employed by one law firm leave that firm and form a second firm; (2) the client retains the same attorneys; (3) the second firm obtains a recovery in the contingent fee case; (4) there is no agreement among the attorneys on how to split fees with the outgoing attorneys; (5) the partnership of the first firm is not in a winding up or dissolution phase; and (6) the dispute is between the first firm and the second firm (not the first firm and the client).
The parties focus many of their arguments on Trenti, Saxhaug, Berger, Roche, Stephenson, Richards & Aluni, Ltd. v. Nartnik, 439 N.W.2d 418 (Minn.App.1989), pet. for rev. denied (Minn. July 12, 1989). Since the question before the court in Trenti was the timing of a quantum meruit action, not the amount to be recovered in that action, Trenti provides little guidance in this case. See id. at 420.
RKMC relies on Stacker & Ravich v. Simon, 411 N.W.2d 217 (Minn.App.1987), pet. for rev. denied (Minn. Nov. 13, 1987), arguing that the court divided the fee according to the relative amounts of time and value invested by each law firm. In Stacker, after a partner withdrew from a partnership, an action was commenced to resolve several financial disagreements. The withdrawing partner and the firm agreed that clients would be allowed to decide whether unfinished business should be completed by the withdrawing partner or by the firm. Id. at 219. The withdrawing partner indicated that "he would `make book' with [the firm] for fees which he collected from clients electing to have him complete work on their cases." Id. The district court correctly distinguished Stacker since in the present case there was no agreement to share fees and because there was no opportunity for the attorneys to delay settlement negotiations.
BJLS argues that Empro Corp. v. Scottland Hotels, Inc., 449 N.W.2d 734 (Minn.App. 1990), is dispositive and controlling on the issue of the amount of a contingent fee claimed by a discharged attorney. Empro, however, stands for the undisputed proposition that when a client discharges an attorney from a contingent fee case, without cause, and the attorney sues the client, the attorney gets paid for the number of hours spent. See id. at 737. Empro did not address the issue of apportioning fees between two law firms where the client is not involved in the suit.
BJLS argues, relying on Shepard v. City of St. Paul, 380 N.W.2d 140 (Minn.App.1985), that Minnesota law requires that hourly *620 rates as well as other factors be taken into account.
In Shepard, the court held:
In awarding attorney's fees under 42 U.S.C. § 1988, the trial court must determine the amount of hours reasonably expended and the hourly rate with specificity.
Id. at 141 (emphasis added). Shepard, however, simply addresses how to award attorney fees under a particular federal civil rights statute. Since the present case does not involve a question of a party seeking attorney fees under section 1988, Shepard is not controlling.
RKMC argues that use of the hourly rates conflicts with settled partnership law. RKMC argues that under the Uniform Partnership Act, Minn.Stat. § 323.30 (1990), the withdrawal of any partner constitutes a dissolution of the original partnership.
As the district court properly noted, RKMC's partnership agreement specifically provides that "the partnership shall not be terminated or wound up by reason of the * * * permanent or temporary withdrawal * * * of one or more Equity Partners or one or more Income Partners." Partners may change their statutory and common law duties by incorporating such changes into their partnership agreements, as long as the major purpose of the change is not to shield wrongdoers from liability. Appletree Square I Ltd. Partnership v. Investmark, Inc., 494 N.W.2d 889, 893 (Minn.App.1993), pet. for rev. denied (Minn. Mar. 16, 1993). Partners are free to vary many aspects of their relationship but they are not free to destroy its fiduciary character. Id. Thus, the statutory provisions applicable to dissolution of a partnership would not apply since the Partnership Agreement prevents the dissolution.
Since there is no controlling Minnesota authority on the issue before this court, we look to other jurisdictions.
RKMC cites, and the district court discussed, several foreign cases. Most of these cases are easily distinguishable since they did not involve the fact situation before us now, or were controlled by precedent unique to that jurisdiction. See Cazares v. Saenz, 208 Cal.App.3d 279, 256 Cal.Rptr. 209, 211 (1989) (parties had a fee allocation agreement); LaBach v. Hampton, 585 S.W.2d 434, 436 (Ky.Ct.App.1979) (controlled by Kentucky Supreme Court case); Lai Ling Cheng v. Modansky Leasing Co., 73 N.Y.2d 454, 541 N.Y.S.2d 742, 744, 539 N.E.2d 570, 572 (1989) (under New York law a discharged attorney may elect either to receive a fixed dollar amount or a contingent fee percentage, and there was a fee agreement).
We are, however, persuaded by the reasoning in La Mantia v. Durst, 561 A.2d 275, 279 (N.J.Super.Ct.App.Div.1989), certification denied, 118 N.J. 181, 570 A.2d 950 (1989). In La Mantia, the plaintiff, as a result of family recommendations, contacted the Evans law firm. The partners decided to take the case and assigned it to one of the partners, Thomas Monte, Jr. The retainer agreement provided for a contingent fee arrangement.
Over the next two years, Monte devoted a substantial amount of his billable hours in developing the case. The Evans firm advanced money for filing fees, expert testimony and other expenses.
Monte withdrew from the Evans firm, taking the case with him. The case went to trial and the jury returned a $2.1 million verdict in plaintiff's favor. While pending on appeal, the case settled for a $1,000,000 lump sum payment plus a lifetime $7,000 monthly annuity. The Evans firm sued.
The court reasoned:
[T]he financial resources of the Evans Firm allowed Monte to fully explore the viability of the claim by obtaining experts and spreading the costs among its partners * * *. These expenditures took place while the claim was still questionable. Background work often determines the ultimate success of the claim. An individual firm's willingness to advance expenses of litigation against contingent future recovery is essential to insure that plaintiffs with difficult personal injury claims can obtain counsel. Recognition that a law firm must typically assume such financial risks furnishes much of the fundamental *621 rationale for permitting contingent fees in personal injury actions.
Every firm faces the possibility that one of the individual attorneys assigned to a matter could leave with a substantially prepared case. This risk is unavoidable since clients have unfettered discretion to obtain or release counsel. When a lawyer leaves his law firm, a litigation client may understandably elect to "follow" the person who was most heavily involved with that litigation. This fact of professional life, however, should not deprive the firm whose services the client initially sought from equitably realizing fruits of its reasonable expectancy in the contingency fee. These include, in addition to recognition of the factor of initial attraction of the client, the quality of the firm's initial investment of time, skill and funds in investigation, construction of pleadings, discovery, choice of experts, research and those other foundational services which shape the ultimate result, good or bad, of every lawsuit. It is not just that a lawyer fortuitously assigned to the matter can leave with a substantially prepared case, which is subject only to a wholly contingent obligation for its preparation, limited to reimbursement on an hourly basis, with no recognition given to the factors mentioned above. There should, in any event, be a record developed together with findings of fact, so as to assure that there is both a fair accommodation of client interests and recognition of the true worth of the inception and preparation phase of a litigated matter.
The courts should not foster such behavior in the bar by permitting the defecting attorney to obtain a windfall. Such windfalls are created where, as here, the trial court fails to recognize the value of the initial firm's willingness to risk the time and money to develop the claim. By compensating the original firm solely for time spent, the trial court does not permit that firm to benefit from the risk taken and thereby discourages firms from taking such cases.
Id. at 279.
We agree with the court in La Mantia that the following factors should be considered in awarding fees: (1) the length of time each firm spent on the case; (2) the proportion of funds invested by each firm; (3) the quality of representation; (4) the result of each firm's efforts; (5) the reason the client changed firms; (6) the viability of the claim at transfer; (7) the amount of recovery realized; and (8) any pre-existing partnership agreements. See id at 278.
Therefore, we reverse the district court's allocation of attorney fees and remand for a determination of the amount of RKMC's attorneys' liens in accordance with the La Mantia factors. The first factor, the length of time each firm spent on the case, will be the most important consideration in that determination. Although the district court rejected La Mantia because it "attempts to weigh highly subjective factors that would result in numerous inconsistent calculations by trial courts," we note that Minnesota law already requires a complex multifaceted inquiry and the weighing of subjective factors. Factors we have considered include:
(1) The time and labor required; (2) the responsibility assumed; (3) the magnitude of the principal amount; (4) the results obtained; (5) the fees customarily charged for similar services; (6) the experience character, reputation, and ability of counsel; (7) the fee arrangements; (8) the circumstances under which the services were rendered; (9) the nature and difficulty of the proposition involved; (10) the doubtful solvency of the client and the apparent difficulties of collection; (11) the anticipation of future services; and (12) the preclusion of other employment.
Kittler & Hedelson v. Sheehan Properties, Inc., 295 Minn. 232, 236-37, 203 N.W.2d 835, 839 (1973).
We emphasize that our holding does not apply to cases in which a discharged attorney sues a client, or to cases in which a client wants to discharge an attorney, with or without cause.
The district court expressed a concern that, without limiting the discharged attorney fees to an amount based upon the attorneys' actual time and hourly rates plus expenses, a *622 client could find it difficult to find a competent successor attorney to handle the case. In a case such as this one, however, finding a successor attorney is not an issue. The clients kept the same attorneys  those attorneys were just working for different firms.
Lastly, we note, that on remand, the district court must take proper steps to safeguard the confidential nature of the settlement agreements.

II. Notice of Review Issues

BJLS filed a notice of review, stating that if this court reverses any aspect of the district court's ruling, it will seek review of the following issues: (1) whether the district court erred in charging the enforcement of the attorney liens against only those cases that have been settled rather than against all of the cases in which RKMC claims liens; (2) whether the district court erred in summarily ordering enforcement of RKMC's liens absent an equitable proceeding brought by RKMC for such purpose; and (3) whether the district court erred in determining that RKMC was entitled to attorney liens absent evidence of RKMC's compliance with the filing requirements of Minn.Stat. § 481.13 (1992).

A. Timing

BJLS argues that the district court erred in charging the enforcement of the attorney liens against only those cases which have been settled rather than against all cases in which appellant claims liens.
The district court noted in its October 15, 1993 order that "BJL & S agrees that this award can be paid to RKM & C from trust account funds while this appeal is pending." As RKMC correctly notes, since BJLS agreed that the payment of these funds was proper, BJLS has waived any objection to such payment and cannot now point to the payment as error.

B. Separate Equitable Proceeding

BJLS contends, relying on Boline v. Doty, 345 N.W.2d 285 (Minn.App.1984), that the district court erred in summarily ordering enforcement of RKMC's liens absent an equitable proceeding brought by appellant for such purpose. In Boline, the court stated that "when a court is enforcing a lien, a separate equitable action is always required." Id. at 289 (emphasis in original). The "separate equitable action" is one that is separate from the underlying action, not separate from a proceeding commenced solely for the determination of the amount of an attorney lien. The attorney lien statute provides that "[t]he liens * * * may be established, and the amount thereof determined, by the court, summarily, in the action or proceeding * * * or such liens may be enforced, and the amount thereof determined, in an action for equitable relief brought for that purpose." Minn.Stat. § 481.13 (1992) (emphasis added). The phrase "the action or proceeding" refers to the underlying claim that gives rise to the claim for attorney fees. Thus, RKMC may enforce its lien without commencing another proceeding solely for the purpose of enforcing the lien established in this action.

C. Filing Requirements

BJLS argues that "nowhere in the record" is there evidence that RKMC served its lien notices on defendants. Since BJLS did not raise this issue below, we will not consider it on appeal. See Thiele v. Stich, 425 N.W.2d 580, 582 (Minn.1988).

DECISION
The district court erred in limiting appellant's attorney lien recovery to an amount based on the attorneys' actual time and hourly rate plus expenses. Therefore, we remand for proceedings in accordance with this opinion. The district court's enforcement of the liens was proper. No separate proceeding is required to enforce the liens.
Reversed and remanded.
NOTES
[1] According to RKMC, this was two weeks before the mediation of the second wave of cases. The parties do not dispute that where a client discharges an attorney, with or without cause, and hires a different attorney, in an action by the discharged attorney against the client, the discharged attorney is entitled to recover an amount based on the attorney's actual time and hourly rate plus actual expenses.