**DORSEY & WHITNEY LLP, lien claimant, Respondent,**

v.

**Andrew GROSSMAN, et al., Appellants.**

No. A07–0358.

Court of Appeals of Minnesota.

May 27, 2008.

412

Perry M. Wilson, III, Angela M. Hall, Dorsey & Whitney, Minneapolis, MN, for respondent.

Timothy D. Kelly, Carrie L. Zochert, Kelly & Berens, Minneapolis, MN, for appellants.

Considered and decided by WRIGHT, Presiding Judge; TOUSSAINT, Chief Judge; and WILLIS, Judge.

## OPINION

WRIGHT, Judge.

This appeal arises out of a disagreement regarding compensation to respondent law firm for its legal representation of appellants. After a summary proceeding under Minn.Stat. § 481.13 (2006), the district court concluded that respondent is entitled to two attorney liens and ordered entry of two judgments against appellants. On appeal, appellants argue that (1) their relationship with respondent constituted a joint venture and was, therefore, not governed by section 481.13; (2) the district court erroneously interpreted their contract with respondent by (a) miscalculating the amount due, and (b) excluding certain work from the scope of the contract; and (3) the district court erroneously interpreted section 481.13 by (a) entering judgments contrary to the plain language of the statute, and (b) declining to entertain their legal-malpractice claim.

We affirm except as to the nature of the judgments entered. Because the district court erroneously directed entry of a $126,236.23 personal judgment against appellant-corporation and failed to identify the property subject to the attorney lien, we affirm the determination of the amount of the lien but reverse as to the nature of the lien and remand for determination of the property subject to this lien. To eliminate ambiguity regarding the nature of the $586,312.20 judgment, we affirm that judgment as modified.

## FACTS

Appellant ABCO Research (ABCO) owns several patents relating to a method for restoring teeth. ABCO obtained these patents from the inventor, Dr. Robert Hasel. Hasel and appellant Andrew Grossman formed ABCO in 1988 for the sole purpose of enforcing and exploiting the patents (the Hasel patents).

In October 1997, respondent Dorsey & Whitney (Dorsey) began representing ABCO and its representatives in licensing and other non-litigation matters, including patent prosecution before the United States Patent and Trademark Office (USP-TO). Dorsey billed ABCO on an hourly basis for this representation.

By August 1999, ABCO decided that it needed to pursue multiple legal actions to stop infringement and to make the Hasel patents profitable. But because the Hasel patents were not generating income sufficient to finance multiple legal actions simultaneously, ABCO could not continue to pay for legal services under a straight billable-hours fee arrangement. Consequently, Grossman, ABCO, and Dorsey entered into a written agreement (the agreement), which "sets out the basis on which [Dorsey] shall provide legal services" to Grossman and ABCO "for the purposes of patent enforcement, patent exploitation, and patent license efforts."[1] The agreement specifies that it does not pertain to "legal services [Dorsey] may provide to [ABCO and Grossman] in matters unrelated to the patent enforcement, patent exploitation, and patent license efforts" for the Hasel patents. The agreement also explicitly provides that ABCO and Grossman are not obligated to undertake "any specific litigation or other enforcement effort," and Dorsey is not required to represent ABCO and Grossman in connection with any specific legal action.

The agreement requires Dorsey to create and maintain two separate billing files: one for litigation services (litigation file) and one for licensing services (licensing file). All time spent on legal services that Dorsey provided on any litigation, including infringement investigations, is billed to the litigation file; all time spent on legal services provided for licensing negotiations and nonlitigation-related agreements is billed to the licensing file. The agreement also requires Dorsey to send ABCO and Grossman monthly statements indicating the "standard matter value at then-current standard rates" for legal services provided with respect to time billed to each file.

In relevant part, the agreement requires ABCO and Grossman to pay Dorsey 40 percent of "any recovery received during [each] quarter as attorneys' fees." The agreement defines "recovery" as

> any income received by [ABCO and Grossman], at any time after the effective date of this agreement, whether through litigation or licensing, and whether through payment on a judgment, court order, settlement, contract, license agreement, or other royalty mechanism, or any other means by which money is paid to or on behalf of [ABCO and Grossman] with respect to patent enforcement, exploitation, and patent license efforts. . . .

But the agreement deducts from the recovery "any amounts paid by [ABCO and Grossman] for expenses and service charges," including out-of-pocket expenses, such as court filing fees, local-counsel fees, costs for depositions and expert witnesses, photocopying, costs for obtaining file histories, telephone and fax charges, and similar expense items.

Pursuant to the agreement, Dorsey represented ABCO in litigation against various entities and pursued licensing efforts on behalf of ABCO and Grossman. Dorsey consistently billed ABCO and Grossman for this work according to the terms of the agreement. During this same time, Dorsey also conducted patent-prosecution work on behalf of ABCO. And Dorsey

---

1. Hasel also signed the agreement in his individual capacity and was, therefore, a party to the agreement. But Hasel is not a party to the action resulting in this appeal.

consistently billed ABCO for the patent-prosecution work on an hourly fee basis.

In October 2005, Dorsey withdrew from its representation of ABCO and Grossman. By that time, Dorsey had received a total of approximately $53,729 from ABCO and Grossman, which the parties agree represents the total amount that ABCO and Grossman paid Dorsey for its legal services prior to Dorsey initiating this attorney-lien action.

In November 2005, Dorsey sent ABCO and Grossman notices of two attorney liens, identifying as the bases for the asserted liens its representation under the agreement and its patent-prosecution work for ABCO. Dorsey also filed a UCC financing statement in connection with each lien. Shortly thereafter, Dorsey petitioned the district court pursuant to Minn.Stat. § 481.13, subd. 1(c) (2006), to determine the amounts of the attorney liens and to enter judgment against ABCO and Grossman for those amounts.

ABCO and Grossman countered Dorsey's petition, arguing that (1) their relationship with Dorsey was a joint venture and, therefore, outside the scope of section 481.13; (2) Dorsey breached the agreement and, therefore, was not entitled to an attorney lien based on the agreement; (3) Dorsey was not entitled to a separate attorney lien for Dorsey's patent-prosecution work because the agreement included that work; (4) the amount that Dorsey claimed was incorrect under the agreement; and (5) Dorsey could not seek a personal judgment pursuant to section 481.13.

After a hearing, the district court wrote to the parties, advising them of its intent to rule in favor of Dorsey. The district court indicated, however, that, based on the evidence submitted by the parties, the district court was unable to determine the "recovery" amount, including applicable deductions, from which fees, and therefore the amount of the liens, were to be calculated.

Consequently, the parties conducted discovery and ultimately stipulated to a number of facts, including the gross recovery from the Hasel patents. But they disagreed as to (1) the amount deductible from the recovery, and (2) whether the agreement included the patent-prosecution work. After a hearing on these remaining issues, the district court concluded that Dorsey is entitled to an attorney lien on the Hasel patents limited to the Hasel patents' proceeds. The district court directed entry of one judgment in the amount of $586,312.20 in favor of Dorsey and against ABCO and Grossman, jointly and severally, and another judgment in the amount of $126,236.23 in favor of Dorsey and against ABCO. The district court further ordered that the liens "remain in existence until the obligations are paid."

Less than one month after the judgments were entered, counsel for ABCO and Grossman wrote to the district court to request clarification of its order. Counsel advised the district court that Dorsey had been attempting to collect on both judgments without regard to whether the funds sought were proceeds from the Hasel patents. In response, the district court issued an amended order, which specified that the $586,312.20 judgment is limited to the proceeds from the Hasel patents but the $126,236.23 judgment "is a separate lien" that is "not limited to the proceeds from the 'Hasel Patents' or in any other way."

This appeal followed. After ABCO and Grossman filed their notice of appeal, Dorsey filed a timely notice of review pursuant to Minn. R. Civ.App. P. 106.

## ISSUES

I. Does the agreement establish a joint venture?

II. Did the district court erroneously interpret the agreement by rejecting appellants' claimed deduction and excluding respondent's patent-prosecution work from the agreement?

III. Did the district court erroneously interpret the attorney-lien statute, Minn.Stat. § 481.13 (2006), by directing entry of personal judgments against appellant-corporation and declining to entertain a legal-malpractice claim in the summary proceeding?

## ANALYSIS

### I.

ABCO and Grossman first argue that the agreement is a joint-venture agreement and, therefore, is not subject to the attorney-lien statute, Minn.Stat. § 481.13 (2006). The district court did not explicitly address this joint-venture argument. But from the district court's silence on this issue and its application of the attorney-lien statute, we infer that the district court concluded that there was no competent evidence demonstrating a joint venture.

■ The existence of a joint venture ordinarily presents an issue of fact, but the district court may decide the issue as a matter of law if there is no competent evidence to support a finding of joint venture. *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 390 (Minn.App.2004), *review denied* (Minn. Aug. 25, 2004). Under this circumstance, we review de novo a district court's determination as a matter of law that a joint venture does not exist. *Id.*

■ Four elements are necessary to establish a joint venture: (1) each party must make a contribution of money, prop-

erty, time, or skill to the enterprise; (2) the parties must have joint proprietorship and control such that each party has a proprietary interest and the right of mutual control over the enterprise; (3) the parties must have an express or implied agreement to share the profits, but not necessarily the losses, from the enterprise; and (4) the parties must have entered into an express or implied contract. *Id.* Here, there is no competent evidence as to the second and third elements.

■ The agreement did not grant Dorsey control over the Hasel patents or authorize Dorsey to make any decisions pertaining to the patent enforcement, exploitation, or licensing efforts. Notwithstanding these omissions from the written agreement, ABCO and Grossman maintain that Dorsey's conduct demonstrated such control because Dorsey substantially influenced ABCO's and Grossman's decisions regarding licensing agreements and demand letters. The district court did not make findings regarding the parties' conduct. But even assuming that Dorsey exercised a substantial degree of influence regarding licensing decisions, such conduct does not amount to joint control. Indeed, it would be expected, even necessary, for Dorsey to recommend certain courses of action as part of its legal representation. Encouraging litigation against one company but not another and recommending or discouraging settlement on particular terms are part of the normal course of an attorney's counseling relationship with the client. These actions do not, however, establish control over the client's property.

ABCO and Grossman point to one incident in which Dorsey arguably exerted influence beyond the scope of the attorney-client relationship. ABCO and Grossman maintain that Dorsey refused to participate in litigation with an alleged-

ly infringing company but subsequently "insisted on attending during the negotiation of the royalty fee that [the company] would pay, and refused to accept the royalty rate that ABCO desired." Again assuming that ABCO's and Grossman's claims are credible, this evidence also is insufficient to establish joint control. It is undisputed that Dorsey had chosen not to act as legal counsel in this matter. As such, Dorsey's actions were necessarily outside the scope of the agreement and, therefore, are not pertinent to our analysis regarding the parties' control. *See Rosenberg v. Heritage Renovations*, 685 N.W.2d 320, 332 (Minn.2004) (discussing parties' conduct "under the . . . agreement" in evaluating joint-control element of joint-venture analysis). Moreover, Dorsey's influence apparently was limited in scope to the royalty negotiation and consistent with its compensation interest in the patent recovery. *See Treichel v. Adams*, 280 Minn. 132, 136, 158 N.W.2d 263, 266 (1968) (holding that creditor was not engaged in joint venture with debtor merely because of giving advice, paying bills, and taking other measures to protect debtor's security). Thus, there is no competent evidence that Dorsey had joint control over ABCO's patent business.

■ Likewise, there is no evidence that Dorsey was sharing in the profits of a joint venture. The agreement entitles Dorsey to 40 percent of the quarterly recovery from the patents with a cap of "3.33 times the standard matter value" of Dorsey's time entries. But "[i]f the amount that one party receives is fixed, regardless of the success or failure of the enterprise, there is no joint venture." *Duxbury*, 681 N.W.2d at 390 (holding that no joint venture existed when investor was "entitled to only a fixed percentage" of farmers' surviving pigs, "regardless of whether the . . . farm was profitable"). Under the agree-

ment, Dorsey receives a portion of the "recovery," which the agreement defines as "income." Dorsey, therefore, agreed to a fee subject to the success of the patents without an offset for ABCO's business expenses. *See Black's Law Dictionary* 1226, 1319 (7th ed.1999) (defining "profit" as the "excess of revenues over expenditures," and "revenue" as "gross income"). Thus, the provision in the agreement that entitles Dorsey to payment in the form of a fixed percentage of the patent recovery, whether that recovery was nothing or the millions of dollars anticipated, did not constitute profit sharing. Because the record is devoid of any competent evidence of joint control or profit sharing, the joint-venture argument is without merit.

■ In addition, we observe that the agreement falls within the plain language of the attorney-lien statute. Under the attorney-lien statute, a lien for compensation exists based on an underlying "agreement for compensation" between the attorney and client. Minn.Stat. § 481.13, subd. 1(a). Here, the agreement sets out the basis on which Dorsey "shall provide legal services" to ABCO and Grossman, expressly refers to them as "clients," and refers to the 40–percent payment arrangement as payment of "attorneys' fees." Indeed, ABCO and Grossman acknowledge that they had an attorney-client relationship with Dorsey. Because the agreement provides for compensation to attorneys for their work in representing clients, the agreement falls within the plain language of section 481.13, and the district court correctly concluded that the attorney-lien statute applies to the agreement.

## II.

■ ABCO and Grossman next challenge the district court's interpretation of the agreement. The construction and effect of an unambiguous contract present

questions of law, which we review de novo. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn.2003). The primary goal of contract interpretation is to determine and enforce the intent of the contracting parties. *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn.2003). When interpreting a written instrument, "the intent of the parties is determined from the plain language of the instrument itself." *Travertine Corp. v. Lexington–Silverwood*, 683 N.W.2d 267, 271 (Minn.2004). We will not rewrite, modify, or limit the effect of a contract provision by a strained construction when the contractual provision is clear and unambiguous. *Id.*

### A.

ABCO and Grossman first argue that the district court misinterpreted the agreement's provisions regarding "recovery," which they acknowledge is the baseline for determining the amount due. Specifically they argue that, under the agreement, they are permitted more deductions than the district court granted. But they do not contend that the agreement's provision regarding deductions is ambiguous.

 When there is an express agreement between an attorney and a client that sets the attorney's compensation, the amount of the attorney's lien for legal services is properly determined by reference to the agreement. *Thomas A. Foster & Assocs. v. Paulson*, 699 N.W.2d 1, 6 (Minn.App.2005). As such, we review de novo whether the district court properly interpreted the agreement when calculating the amount due under its terms. *See Denelsbeck*, 666 N.W.2d at 346 (stating that de novo standard of review applies to contract interpretation); *Paulson*, 699 N.W.2d at 4 (stating that de novo standard of review applies to method used to calculate amount of lien).

 Since the parties stipulated to all other facts pertinent to calculating the amount due—ABCO's gross recovery and the amount ABCO and Grossman remitted to Dorsey—the only dispute concerns the deductions. To determine the amount due, the fee provisions of the agreement govern. These provisions set Dorsey's attorney fees in the amount of 40 percent of the net recovery from the Hasel patents. According to the terms of the agreement, the net recovery equals the recovery less "any amounts paid by [ABCO and Grossman] for expenses and service charges."

Regarding expenses and service charges, the agreement states: "This matter will require out-of-pocket expenses, such as court filing fees, local counsel fees, costs for depositions and expert witnesses, photocopying, costs of obtaining file histories, telephone and fax charges, and similar expense items." Although this list is not exhaustive, the nature of the contemplated deductions is apparent from the examples listed. The plain language of the agreement demonstrates that the parties intended deductions only for expenses and service charges attributable to the legal work performed by Dorsey pursuant to the agreement.

ABCO and Grossman argue that $480,161 should be deducted in addition to the deduction of $858,350 to which Dorsey agreed. But ABCO and Grossman acknowledge that "[t]he majority of the approximately $480,161 in disputed deductions consist[s] of attorney fees that ABCO paid to law firms other than Dorsey, in part because Dorsey refused to continue to represent ABCO under the terms of the 1999 Agreement." ABCO and Grossman also claim deductions for "expenses to fund licensing efforts" conducted by other law firms. Because these expenses are outside the scope of Dorsey's representation under the agreement, they are not deductible

from the recovery on which Dorsey's compensation for legal services is based. Indeed, these fees would be deductible only if the agreement is interpreted in an internally inconsistent manner that is contrary to its plain language because the agreement expressly provides that Dorsey was under no obligation to undertake particular licensing efforts. The deduction of these fees, if permitted, would penalize Dorsey for exercising its contractual rights.

ABCO and Grossman also claim, as part of the $480,161 disputed deduction, $128,226 for legal fees that ABCO paid to Danville Engineering, Inc. as a condition of the voluntary dismissal of a patent action that ABCO initiated against Danville in federal court. The agreement plainly envisions deductions for routine litigation-related expenses. Opposing counsel's attorney fees are not routine litigation-related expenses. *See F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 126, 94 S.Ct. 2157, 2163, 40 L.Ed.2d 703 (1974) (describing general rule under which attorney fees are not ordinarily recoverable in federal litigation, absent statute or enforceable contract providing for them). Thus, the Danville fees are outside the scope of the agreement.

Because the additional expenses ABCO and Grossman claim are not routine litigation expenses related to Dorsey's legal representation, they are outside the scope of the agreement. Accordingly, the district court correctly denied the disputed deductions.

### B.

ABCO and Grossman next challenge the district court's entry of judgment for

$126,236.23 as compensation for Dorsey's patent-prosecution work. Arguing that the relevant language in the agreement is ambiguous, they assert that the district court erred by interpreting the agreement to exclude Dorsey's patent-prosecution work.

▬▬▬ Whether a contract provision is ambiguous is a question of law, which we review de novo. *Denelsbeck*, 666 N.W.2d at 346. "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Id.* (quotation omitted).

▬▬▬ The plain language of the agreement demonstrates its limited scope. The first paragraph of the agreement states that the agreement "sets out the basis on which [Dorsey] shall provide legal services ... for the purposes of patent enforcement, patent exploitation, and patent license efforts." By its terms, the agreement expressly anticipates Dorsey's additional, separate representation and excludes from the agreement "legal services [Dorsey] may provide to [ABCO and Grossman] in matters unrelated to the patent enforcement, patent exploitation, and patent license efforts" pertaining to the Hasel patents. The agreement explicitly refers to several types of representation and excludes all other matters. By operation of the plain language of the agreement, patent-prosecution work is excluded.[2]

Contrary to the argument of ABCO and Grossman, the plain language of the agreement is unambiguous. It is susceptible of only one meaning. *Id.* Accordingly, we

---

**2.** Patent prosecution is the process of securing patent approval from the USPTO. Actions regarding patent infringement and enforcement, by comparison, are civil actions pursued in federal court; the USPTO has no jurisdiction over questions of infringement and enforcement. http://www. uspto.gov/web/offices/pac/doc/general/index.html# patent.

decline to address evidence of the parties' conduct after signing the agreement, which both parties urge us to consider. *See id.* at 346–47 (requiring courts to give unambiguous contract language plain and ordinary meaning); *cf. Ecolab, Inc. v. Gartland,* 537 N.W.2d 291, 295 (Minn.App. 1995) (permitting consideration of extrinsic evidence to resolve ambiguity).

## III.

■ Finally, ABCO and Grossman argue that the district court erroneously applied the attorney-lien statute. Interpretation of the attorney-lien statute presents a question of law, which we review de novo. *Paulson,* 699 N.W.2d at 4.

■ When interpreting a statute, we must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2006). In doing so, we first determine whether the statute's language, on its face, is ambiguous. *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn. 2001). A statute's language is ambiguous only when its language is subject to more than one reasonable interpretation. *Amaral v. Saint Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999). We construe words and phrases according to their plain and ordinary meaning. *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn.1980); *see also* Minn.Stat. § 645.08(1) (2006) (providing that words are construed according to their common usage).

## A.

ABCO and Grossman first argue that the district court erred by awarding personal judgments against them after a summary attorney-lien proceeding. Dorsey counters that the attorney-lien statute not only authorizes personal judgments but also entitles a lien claimant to an unqualified judgment for "the amount due." On

that basis, Dorsey argues that the district court erred by limiting the scope of the judgment against ABCO and Grossman.

The parties' arguments raise two issues: (1) the purpose and scope of a summary proceeding under Minn.Stat. § 481.13, subd. 1(c); and (2) the type of judgment that must result, if any, from such a proceeding. We have previously held that, because of the summary nature of a proceeding under section 481.13, subdivision 1(c), that proceeding is not the appropriate forum for addressing a claim of legal malpractice. *Paulson,* 699 N.W.2d at 7–8. But to address the intended purpose and result of the summary proceeding under section 481.13, subdivision 1(c), we look to the language and history of the statute.

■ An attorney lien traces its origins to common law, but the Minnesota legislature "has long since preempted this field and has substituted statutory procedures." *Boline v. Doty,* 345 N.W.2d 285, 288 (Minn.App.1984). An attorney lien is an equitable lien created to prevent a client from benefiting from an attorney's services without paying for those services. *Paulson,* 699 N.W.2d at 5. An attorney, therefore, "has a lien for compensation whether the agreement for compensation is expressed or implied." Minn.Stat. § 481.13, subd. 1(a). The lien granted under subdivision 1(a), is an inchoate lien that attaches at the commencement of the legal representation to the cause of action or the client's interest in "any money or property involved in or affected by any action or proceeding in which the attorney may have been employed." *Id.; Paulson,* 699 N.W.2d at 5.

■ To make the lien choate, an attorney may petition the district court to summarily establish the lien. Minn.Stat. § 481.13, subd. 1(c); *Paulson,* 699 N.W.2d at 5–6; *see also Black's Law Dictionary*

934 (7th ed.1999) (defining "choate lien" as one in which lienholder, property, and monetary amount are established, leaving nothing else to be done to make it enforceable). Establishment of the lien is the district court's recognition of the client's debt to the attorney and effects a "hold or claim on the [client's] property as security for [the] debt." *Boline,* 345 N.W.2d at 288. If the client does not pay the attorney the amount due, that property is subject to forfeiture. *Id.* at 289 (defining attorney lien as "a claim against an interest in property that may result in the deprivation of that property"). Enforcement of the attorney lien forecloses on the client's interest in the property to which the lien is attached when the client fails to satisfy the debt that the lien secures. *Id.* at 290; *cf.* Minn.Stat. § 514.10 (2006) (describing foreclosure of mechanic's lien as enforcement of the lien). As such, the lien may be enforced in a variety of ways, including through the ordered sale or mortgage of the property to which the lien attaches. *Boline,* 345 N.W.2d at 290.

Last amended in 2002, 2002 Minn. Laws ch. 403, § 2, at 1707–08, the current attorney-lien statute provides solely for a summary proceeding for the establishment of an attorney lien:

> A lien provided by paragraph[ ](a) ... may be established, and the amount of the lien may be determined, summarily by the [district] court under this paragraph on the application of the lien claimant. ...
>
> Judgment shall be entered under the direction of the [district] court, adjudging the amount due.

Minn.Stat. § 481.13, subd. 1(c). The statute does not address enforcement of the lien except to proscribe such enforcement beyond the statute of limitations. *See* Minn.Stat. § 481.13, subd. 3 (setting forth applicable time periods for enforcing attorney liens against real property).

This omission of any substantive reference to lien enforcement is significant when considered in light of the prior version of the statute, which provided:

> The liens ... may be established, and the amount thereof determined, by the [district] court, summarily, in the action or proceeding ... *or such liens may be enforced, and the amount thereof determined, by the [district] court,* in an action for equitable relief brought for that purpose.

Minn.Stat. § 481.13(3) (2000) (emphasis added). Under the prior version of the statute, an attorney seeking to collect unpaid legal fees could petition the district court in the action or proceeding in which the attorney was representing the client to summarily establish an attorney lien; or the attorney could initiate an equitable action and request establishment *and enforcement* of the attorney lien. *See In re L–tryptophan Cases,* 518 N.W.2d 616, 622 (Minn.App.1994) (holding that separate equitable proceeding could be used to establish and enforce attorney lien pursuant to Minn.Stat. § 481.13(3) (1992)).

When it amended the statute in 2002, the legislature removed the language permitting an enforcement proceeding under the statute but maintained the establishment proceeding. 2002 Minn. Laws ch. 403, § 2, at 1707–08. The attorney lien continues to be security for a debt. *Boline,* 345 N.W.2d at 288. As such, the establishment of a lien pursuant to section 481.13, subdivision 1(c), enables the attorney to pursue any available methods for foreclosing on a security interest if the client does not satisfy the underlying debt. *See id.* at 290 (identifying court-ordered sale or mortgage as possible enforcement methods); *cf.* Minn.Stat. § 514.10 (de-

scribing foreclosure of mechanic's lien as enforcement of lien).

In light of the statutory amendment, the plain language of the current version of the attorney-lien statute authorizes the district court only to summarily establish the lien. Minn.Stat. § 481.13, subd. 1(c) (2006). It no longer authorizes the district court to enforce the lien in the summary proceeding; rather, it is silent as to the proper forum and means for enforcing the lien. *Id. But see Paulson,* 699 N.W.2d at 8 (stating in dictum that statute provides for "a summary proceeding to establish and enforce a lien"). In addition, the attorney-lien statute directs that, to "establish" a lien, the district court must identify the subject property. *See* Minn. Stat. § 481.13, subd. 1(a) (describing possible subjects of attorney lien); *Boline,* 345 N.W.2d at 289 (describing an attorney lien as "an interest in property"). Thus, when a lien claimant petitions the district court under section 481.13, subdivision 1(c), the district court must determine (1) the lienholder; (2) the subject of the lien as defined by the attorney-lien statute; and (3) the amount due. Minn.Stat. § 481.13, subd. 1(c).

The resulting judgment is in the nature of a declaratory judgment that establishes the lien, as defined by the district court with regard to the lienholder, the subject, and the amount. *Cf.* Minn. Stat. §§ 555.01, 555.02 (2006) (describing district court's power to "declare rights, status, and other legal relations" affected by contract or statute). Accordingly, Dorsey's argument that the attorney-lien statute authorizes an unqualified personal judgment, independent of the action or proceeding in which the attorney provided representation, is without merit.

Here, the district court has essentially complied with the attorney-lien statute's requirement with regard to the $586,312.20 judgment. Although the district court improperly characterized the judgment as a personal judgment against ABCO and Grossman, the district court also determined the amount due and identified the proceeds from the Hasel patents as the source of payment.[3] By undertaking the steps necessary to establish the lien, the district court effectively established an attorney lien in favor of Dorsey and against ABCO's and Grossman's interests in the Hasel patents' proceeds and adjudged the amount due. And because both ABCO and Grossman were parties to the agreement and received the benefit of Dorsey's representation, contrary to ABCO's and Grossman's argument, the lien against *both* ABCO's and Grossman's interests in the patent proceeds is proper.[4]

In contrast, the $126,236.23 judgment against ABCO for the patent-prosecution

---

**3.** At oral argument, counsel for ABCO and Grossman argued that the district court had erroneously identified the proceeds of the patents as the subject of the lien flowing from the agreement. Rather, counsel suggested, the agreement pertained to various litigation and licensing efforts, and the lien should have applied to the settlement and licensing agreements resulting from Dorsey's representation. ABCO and Grossman were free to present this argument to the district court but did not do so. Accordingly, the argument is waived on appeal. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988).

**4.** ABCO and Grossman also argue that a personal judgment against Grossman was improper and unfair. Because we conclude that the statute does not authorize personal judgments at all, we need not specifically address this argument. But we observe that, because they do not dispute that Grossman signed the agreement in his individual capacity and received the benefit of Dorsey's representation, the district court properly made Grossman's interest in the patent proceeds, if any, subject to the lien.

work is an unqualified personal judgment. Although the district court determined the amount due, it did not identify any property as the subject of the lien. As such, the district court erred by awarding Dorsey an unqualified personal judgment against ABCO. We, therefore, remand to the district court for determination of the proper subject of the lien, as defined by section 481.13, subdivision 1(a), and for entry of a judgment establishing a lien in accordance with the requirements identified herein.

### B.

▮▮▮ ABCO and Grossman also argue that the district court erred by declining to consider their legal-malpractice claim in the attorney-lien proceeding. This argument is without merit. The attorney-lien statute sets forth a summary proceeding to establish an attorney lien. Minn.Stat. § 481.13, subd. 1(c). "Consideration of complex questions of professional negligence in the lien action is contrary to the legislative intent expressed in the language of the statute." *Paulson*, 699 N.W.2d at 8. Without addressing the appropriateness of bringing a legal-malpractice action, we observe that the establishment of an attorney lien in favor of Dorsey does not prevent ABCO and Grossman from bringing such an action in a separate proceeding. *Id.* Indeed, a separate proceeding, when available, is preferable to the summary proceeding afforded under section 481.13. *Id.* As such, the district court did not err by declining to address ABCO's and Grossman's legal-malpractice claim in the summary attorney-lien proceeding.

### DECISION

The parties' relationship was not a joint venture, and application of the attorney-lien statute was appropriate. The district court correctly interpreted the agreement with regard to the deductions and the scope of Dorsey's representation. The summary attorney-lien proceeding was not the appropriate forum to address ABCO's and Grossman's legal-malpractice claim. Although the district court erred by directing entry of personal judgments against ABCO and Grossman, we affirm the $586,312.20 judgment as modified to eliminate confusion regarding the nature and effect of the judgment. In doing so, the modification establishes an attorney lien in the amount of $586,312.20 in favor of Dorsey and against ABCO's and Grossman's interests in the proceeds of the Hasel patents. Because the district court correctly determined $126,236.23 as the amount of the attorney lien for patent-prosecution work but erroneously directed entry of a personal judgment and thereby failed to identify the property subject to that attorney lien, we affirm in part, reverse in part, and remand for identification of the property subject to the attorney lien for the patent-prosecution work. The decision whether to reopen the record on remand rests within the district court's discretion.

**Affirmed as modified in part, reversed in part, and remanded.**