*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0455**

CSM Equities, LLC,
Appellant,

vs.

Woodland Village Investments Limited Partnership, et al.,
Respondents.

**Filed January 25, 2016
Affirmed as modified
Hooten, Judge**

Hennepin County District Court
File No. 27-CV-12-13846

Richard T. Ostlund, Randy G. Gullickson, Steven C. Kerbaugh, Anthony Ostlund Baer & Louwagie P.A., Minneapolis, Minnesota (for appellant)

Timothy D. Kelly, Dykema Gossett PLLC, Minneapolis, Minnesota; and

Christopher R. Morris, Casey D. Marshall, Bassford Remele, PA, Minneapolis, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Hooten, Judge; and Smith, Judge.

## UNPUBLISHED OPINION

**HOOTEN**, Judge

Appellant challenges the district court's dismissal of its claims on summary judgment and the district court's award of costs and disbursements to respondents. In a

cross-appeal, respondents claim that the district court erred by rejecting their statute of limitations defense and denying their motion for attorney fees. We affirm as modified.

## FACTS

Appellant CSM Equities, LLC (CSM) is a company in the business of acquiring, developing, and managing real estate. Respondents Woodland Village Investments Limited Partnership (Woodland), ATEK Companies, Inc., and Acrometal Management Corporation (Acrometal) are part of a network of companies known as the ATEK Family of Companies. Respondent William Bieber and his two daughters have a sole ownership interest in the ATEK Family of Companies, and respondent Robert Levy is the former chief executive officer of Acrometal.

In 1986, Bieber acquired a manufacturing facility in Plymouth, Minnesota, which he eventually conveyed to Woodland. The Plymouth facility was equipped as a manufacturing facility for aluminum casting and included a foundry. Woodland leased the Plymouth facility to Progress Casting Group, Inc. (Progress), another company owned by Bieber. Progress was in the business of manufacturing and selling aluminum casting products, and it used the Plymouth facility to manufacture its products.

In mid-2003, one of Progress' customers, Harley-Davidson (Harley), notified Progress that it intended to find another supplier for certain parts manufactured at the Plymouth facility. Harley was Progress' biggest customer, accounting for approximately half of its revenues, and the loss of Harley's business would mean that Progress would lose approximately $19 million annually in sales. In an attempt to keep Harley's business, Progress decided to lower costs by opening a facility in a non-union state.

2

In December 2003, Progress adopted a 2004 business plan, which addressed the impact of Harley's planned change in suppliers and Progress' plan to open a non-union facility outside of Minnesota. In February 2004, Progress met with its lender and provided it with the 2004 business plan. Progress eventually decided to build a new facility in Iowa, and in October 2004, it began applying for loans and engaging in workforce recruitment efforts.

In early 2004, Woodland listed the Plymouth facility for sale subject to a six-year lease to Progress without informing its broker of Progress' plans to build a manufacturing facility outside the state. In the fall of 2004, CSM expressed an interest in purchasing the Plymouth facility. During negotiations, CSM learned that Progress' business was growing. CSM and Woodland executed a purchase agreement on December 23, 2004. The purchase agreement provided for a six-year lease term, but CSM requested before closing that the lease term be extended to seven years. Progress refused to extend the term of the lease, but compromised with CSM by ultimately agreeing to extend the lease to a seventh year, while retaining an option to reduce the space that it leased during the seventh year of the lease. The lease also included provisions for returning the facility to a certain condition and removing certain equipment when Progress vacated the premises. Progress and CSM entered into the lease on May 4, 2005, and CSM closed on the purchase of the facility for $8.1 million on May 12, 2005.

From the date of closing to mid-2008, Progress paid the agreed rent to CSM. In the fall of 2008, however, because its business was damaged by the economic recession, Progress requested rent concessions. During the negotiations regarding the rent

3

concessions, Progress informed CSM that it had opened a facility in Iowa. CSM granted Progress temporary rent relief in exchange for the discharge of the reduction option and an extension of the lease term from 2012 to January 31, 2017.

In October 2009, Progress sold its business at the Plymouth facility to Wellman Dynamics Corporation (Wellman). CSM did not consent to the transfer as required under the lease, but Wellman began occupying the Plymouth facility in November 2009. CSM filed eviction papers against Wellman, Progress, and Acrometal in February 2010, and the district court granted summary judgment to CSM in the eviction action in January 2011. Wellman operated the Plymouth facility and paid the rent due to CSM under the lease from November 2009 until its eviction in January 2011.

Because Progress was still liable under the lease for rent and operating expenses until 2017, Progress entered into a "Mutual Release and Settlement Agreement" with CSM on July 28, 2011. The agreement provided for entry of a consent judgment in the amount of $2,837,500 in favor of CSM. Progress filed for bankruptcy on April 13, 2012, and CSM filed a claim in the bankruptcy matter for $3,065,214 based on the consent judgment. CSM eventually sold the Plymouth facility for $4.1 million in 2013.

CSM commenced this action against respondents in June 2012, requesting that the district court order an accounting and constructive trust and asserting claims of fraudulent inducement, unjust enrichment, aiding and abetting, and civil conspiracy. In alleging fraudulent inducement, CSM claimed that respondents represented to CSM that Progress would be a long-term tenant at the Plymouth facility and failed to disclose the plans to open a facility in Iowa and move a substantial part of Progress' business there. Respondents

4

moved to dismiss the complaint for failing to plead fraud with particularity and for failure to state a claim upon which relief can be granted. In a December 17, 2012 order, the district court, converting respondents' motion for dismissal into a summary judgment motion, granted summary judgment as to CSM's unjust enrichment claim and request for an accounting and constructive trust, but denied it as to the other claims. Respondents again moved for summary judgment on the remaining claims, and the district court granted their motion and dismissed CSM's complaint on September 17, 2014. Respondents moved for attorney fees, costs, and disbursements. In a February 6, 2015 order, the district court denied respondents' motion for attorney fees, but awarded respondents $141,778.66 in costs and disbursements. Both CSM and respondents appeal.

## D E C I S I O N

### I.

As a threshold matter, respondents argue in their cross-appeal that CSM's claims are time-barred as a matter of law because CSM failed to exercise reasonable diligence and, as a result, did not timely discover the facts that allegedly support its claim of fraud. In Minnesota, claims of fraud must be brought within six years. Minn. Stat. § 541.05, subd. 1(6) (Supp. 2015). "The 6-year period begins to run when the facts constituting fraud were discovered or, by reasonable diligence, should have been discovered." *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985).

> [T]he facts constituting the fraud are deemed to have been discovered when, with reasonable diligence, *they could and ought to have been* discovered. The mere fact that the aggrieved party did not actually discover the fraud will not extend the statutory limitation, if it appears that the failure

5

> sooner to discover it was the result of negligence, and inconsistent with reasonable diligence.

*Bustad v. Bustad*, 263 Minn. 238, 242, 116 N.W.2d 552, 555 (1962) (emphasis added) (quotation omitted).  When fraud should have reasonably been discovered is a question of fact.  *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 684 (Minn. App. 2010). "Where the evidence leaves no room for reasonable minds to differ on the issue, however, the court may properly resolve the issue as a matter of law."  *Id.* at 684–85 (quotation omitted).

The district court rejected respondents' argument that CSM's claims were time-barred as a matter of law.  The district court found that "reasonable minds could differ on whether CSM should have discovered information on the Iowa [f]acility by reasonable diligence before June 2006," creating a question of fact as to when CSM should have discovered the alleged fraud by reasonable diligence.

Here, CSM alleges that respondents fraudulently induced it to purchase the Plymouth facility.  CSM claims that it did not learn of the Iowa facility until September 2008.  The parties closed on the transaction in May 2005, and CSM sued respondents for fraud in June 2012.  Therefore, the question is whether CSM should have discovered respondents' alleged fraud before June 2006.

Respondents argue that the knowledge CSM possessed at closing establishes that CSM failed to exercise reasonable diligence.  Specifically, respondents note that, at the time of closing, CSM had negotiated the reduction option in the lease, had the right to review Progress' financial statements, and should have known about the Iowa plant.  In

regard to CSM's knowledge of the Iowa plant, respondents point out that the construction of the facility was covered in an industry magazine, as well as in an Iowa newspaper and in a bulletin issued by the Associated Press.

"A plaintiff must exercise reasonable diligence when he or she has notice of a possible cause of action for fraud." *Id.* at 684 (quotations omitted). A fact question remains in this case regarding whether CSM had notice of the facts underlying its fraud claim against respondents before June 2006. While CSM *could have known* before June 2006 about Progress' plan to move its manufacturing plant to Iowa, a question remains regarding whether CSM *ought to have known* about the plan.

Respondents argue that CSM's claims are time-barred because CSM did not exercise reasonable diligence, citing three cases where courts have held as a matter of law that plaintiff had not exercised due diligence. But, those cases are distinguishable from the present case. In *Bustad*, the Minnesota Supreme Court held as a matter of law that the alleged fraud was discoverable more than six years before the commencement of the action in 1960 where defendant allegedly incurred debts to plaintiff as early as 1930 and made no payments after 1951, despite repeated requests for payment. 263 Minn. at 238–42, 116 N.W.2d at 553–55. In *Veldhuizen v. A.O. Smith Corp.*, the court found that the plaintiffs "knew almost from the start that the promised benefits which induced them to purchase the [defendant's] silos did not materialize" and that, therefore, a duty to investigate was triggered when the problems plaintiffs experienced were attributed to the silos by the plaintiffs' veterinarians. 839 F. Supp. 669, 675–76 (D. Minn. 1993) (applying Minnesota law). *Bustad* and *Veldhuizen* are distinguishable from the present case because CSM did

7

not have actual knowledge of the alleged fraud until 2008. Furthermore, unlike in *Veldhuizen*, CSM did not experience any adverse effects as a result of the relocation of the plant that would have put it on notice of the alleged fraud before 2008.

In the last case cited by respondent, *Hope v. Klabal*, the Eighth Circuit held that the plaintiff failed to establish a genuine issue of material fact as to her diligence in discovering the fraud where the plaintiff, a sophisticated businessperson, purchased $10 million of artwork without independently confirming the value of the works and with notice of the fact that the insurance valuations she was provided were not statements of the art's fair market value. 457 F.3d 784, 792 (8th Cir. 2006) (applying Minnesota law). *Hope* is distinguishable because in this case there was an independent appraisal, which valued the Plymouth facility at $8.9 million, and CSM representatives inquired into the value of the facility by touring the facility and reviewing Progress' financial records. Unlike the plaintiff in *Hope*, CSM actively investigated the value of the investment and conducted an independent inquiry into the facility's value, and the inquiry created no reason to suspect that respondents' representations were false.

Because reasonable minds could differ regarding when CSM, by reasonable diligence, could and ought to have discovered the alleged fraud, the district court did not err in holding that CSM's claims are not time barred as a matter of law.

## II.

CSM argues that the district court erred in granting summary judgment to respondents on CSM's fraudulent inducement claim. In its complaint, CSM alleged that respondents fraudulently induced CSM to enter into the purchase agreement by

8

representing to CSM that Progress was a stable, long-term tenant of the Plymouth facility and not disclosing that Progress was in the process of opening a facility in Iowa and transferring a significant portion of its production there.

**Reliance on Respondents' Representations**

CSM first alleges that the district court erred in granting summary judgment to respondents on the fraudulent inducement claim because there are genuine issues of material fact regarding whether its reliance on respondents' representations was reasonable.

Appellate courts "review a district court's grant of summary judgment de novo to determine whether any genuine issue of material fact exists and whether the district court erred in applying the law." *Larson v. Nw. Mut. Life Ins. Co.*, 855 N.W.2d 293, 299 (Minn. 2014). "[S]ummary judgment is inappropriate when reasonable persons might draw different conclusions from the evidence presented." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997). But, "[a] defendant is entitled to judgment as a matter of law when the record reflects a complete lack of proof on an essential element of the plaintiff's claim." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). We review the evidence in the light most favorable to the party against whom summary judgment was granted. *McIntosh Cty. Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 545 (Minn. 2008).

A claim for fraudulent inducement requires: (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of its falsity or without knowing whether it is true or false; (3) with the intent to induce another to act in

9

reliance thereon; (4) actual reliance thereon; and (5) pecuniary damages caused by the reliance. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

Because the parties' agreement is governed by a written document, the parol evidence rule applies. "The parol evidence rule excludes evidence outside a written document which varies or contradicts the plain terms of the document." *Johnson Bldg. Co. v. River Bluff Dev. Co.*, 374 N.W.2d 187, 193 (Minn. 1985). But, the parol evidence rule does not exclude evidence of fraudulent oral representations by one party that induce another party to enter into a written contract. *Id.* Whether reliance on an oral representation is reasonable is a question of fact for the jury. *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 321 (Minn. 2007). Courts may "find that reliance on an oral representation was unjustifiable as a matter of law only if the written contract provision explicitly stated a fact completely contradictory to the claimed misrepresentation." *Johnson*, 374 N.W.2d at 194. But if an oral representation is not directly contradictory to the written contract, the trier of fact decides whether there was reasonable reliance. *Id.*

David Carland, a CSM representative who toured the Plymouth facility, testified that respondents made misrepresentations to him when he was exploring the possibility of purchasing the CSM facility:

> I was approached to buy a building, and you know, I was convinced and enticed to buy the building based on a representation . . . that the business that was being conducted, the manufacturing that was being done in that building needed to be done specifically [in] that building, that they had to have that building, and that they were going to continue—that it was critical . . . to the success of that account that they manufacture within that building. That they were extremely entrenched within that building.

10

Carland further testified that the real estate broker's selling point on the Plymouth facility was that the building was "an integral operation for Progress" and that CSM acquired the Plymouth facility "in reliance and [based upon] assurances that the Harley production was there for the foreseeable future." CSM offered an expert report stating that plans to move production to a new facility in Iowa because of the threatened loss of Harley's business would have been material for any purchaser of the Plymouth facility.

In granting summary judgment on CSM's fraudulent inducement claim, the district court held that CSM's reliance on respondents' representations was unjustifiable as a matter of law because such representations were directly contradictory to the terms of the purchase agreement and the lease.

We agree. The representations that respondents allegedly made were directly contradictory to terms in the purchase agreement and the lease. The seven-year lease term is directly contradictory to the representation that Progress would be a long-term tenant because it explicitly limited the length of time that Progress was obligated to remain in the building. The parties extensively discussed and negotiated the length of the lease. Indeed, before closing, CSM asked for a longer lease term, and Progress only agreed to the seventh year with a reduction option. The reduction option is also inconsistent with Progress being a long-term tenant, as the provision gave Progress the option of reducing its use of the Plymouth facility even during the lease term. Further, the provisions for restoring the property to a certain condition and removing certain equipment when Progress vacated the facility contradict the representation that Progress would be a long-term tenant because

11

they provide conditions for exiting the building that could be exercised at the end of the lease. Additionally, both parties had the right not to renew Progress' tenancy at the end of the lease term. Because the terms of the lease and the purchase agreement directly contradict the representation that Progress would be a long-term tenant, the district court did not err in holding that CSM's fraudulent inducement claim fails as a matter of law.

**Duty to Disclose**

CSM also argues that the district court erred in finding that respondents had no duty to disclose their plans regarding the Plymouth facility, contending that it was denied the opportunity to weigh the risk that Progress might leave the facility before the end of the lease term. In a footnote, the district court concluded that although failure to disclose material information may constitute fraud, there was no duty to disclose here because the transaction at issue was an arm's-length transaction between "sophisticated entities, owned and operated by sophisticated businessmen, with sophisticated lawyers" and CSM had sufficient time and opportunity to conduct due diligence.

Failure to disclose material information may constitute fraud, but "[b]efore nondisclosure may constitute fraud . . . , there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him." *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 365, 244 N.W.2d 648, 650 (Minn. 1976). One party generally has no duty to disclose material facts to another party unless special circumstances exist. *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014). "[A] duty to disclose may arise if . . . one party has special

12

knowledge of material facts to which the other party does not have access. If a party conceals these facts, knowing that the other party acts on the presumption that no such facts exist, nondisclosure may constitute fraud." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 812 (Minn. App. 2010) (alteration omitted) (quotations and citation omitted), *review denied* (Minn. Sept. 29, 2010).

We agree with the district court that no duty to disclose existed between CSM and respondents. The present case involves sophisticated businesspeople conducting an adversarial, arm's-length transaction, and "[c]ourts applying Minnesota law have been reluctant to impose a duty to disclose material facts in arm's-length business transactions between commercial entities." *Id.* at 813; *see, e.g., Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046, 1065 (D. Minn. 2001) (applying Minnesota law and granting summary judgment to defendant on plaintiff's fraud claims, concluding that when parties were engaged in "an arms length business transaction" there was no duty to disclose omitted information).

CSM argues that respondents "made representations regarding [Progress] remaining a long-term, stable tenant of the Plymouth [f]acility without qualifying those statements or disclosing . . . the material facts that [respondents] intended to open a new Iowa [f]acility and transfer the business of [Progress'] most valuable customer to that [f]acility." But, respondents specifically listed the Plymouth facility for sale subject to a six-year lease to Progress, negating any reasonable expectation that Progress would lease the building beyond that term. Furthermore, the parties actively negotiated the length of the lease term before closing on the facility and entering into the lease. CSM toured the building and had the right under the purchase agreement to inspect the building for its acceptability "in its

13

sole and absolute discretion," including "economic feasibility of development [and] market feasibility." Moreover, it is not clear that respondents' alleged representation that Progress would be a "long-term, stable tenant" is inconsistent with the seven-year lease term. And, despite CSM's arguments that it was denied the opportunity to weigh the risk that Progress would leave before the end of the lease term, Progress could have moved all production out of the Plymouth facility immediately after closing and still have complied with the terms of the lease as long as it continued to pay rent and fulfill its other obligations. Under these circumstances, we agree with the district court that respondents did not have a duty to disclose their plans to open a facility in Iowa and transfer the Harley business to the facility.

### III.

CSM claims that the district court erred in granting summary judgment to respondents on its unjust enrichment claim. Unjust enrichment is an equitable doctrine. *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. App. 1992). "In order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. App. 2001).

CSM argues that the district court erred in granting summary judgment to respondents on its unjust enrichment claim because it conferred a benefit on respondents, namely "an exorbitant purchase price," and that it would be unjust to allow respondents to retain the benefit. But, "equitable relief," such as recovery on a theory of unjust

14

enrichment, "cannot be granted where the rights of the parties are governed by a valid contract." *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981). Because the parties' rights were governed by a contract here, the district court properly granted respondents' motion for summary judgment on the unjust enrichment claim.

**IV.**

CSM challenges the district court's grant of summary judgment to respondents on CSM's request for an accounting and constructive trust. An equitable accounting is primarily available only "when a fiduciary owes an equitable duty to account and when the accounts at issue are exceedingly complicated." *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 57 n.3 (Minn. 2012).

The district court found that neither of the circumstances outlined in *United Prairie Bank* were present in this matter. CSM does not challenge the district court's conclusion that the present case does not fall into either of the *United Prairie Bank* circumstances, but argues that those circumstances are not exclusive. CSM cites *Keough v. St. Paul Milk Co.*, 205 Minn. 96, 103, 285 N.W. 809, 815 (1939), for the proposition that "an accounting generally will be given where [fraud] is charged." But here, although CSM presented a fraud claim, the claim fails as a matter of law. Because CSM has failed to show that a genuine issue of material fact exists regarding its fraud claim and has failed to show that its claim fits within the circumstances outlined in *United Prairie Bank*, the district court did not err in granting summary judgment to respondents on CSM's request for an accounting.

15

Likewise, the district court properly granted summary judgment to respondents on CSM's request for a constructive trust. A constructive trust is "purely a creation of equity designed to provide a remedy for the prevention of unjust enrichment where a person holding property is under a duty to convey it to another to whom it justly belongs." *Knox v. Knox*, 222 Minn. 477, 481, 25 N.W.2d 225, 228 (1946). Fraud does not need to be present in order to impose a constructive trust, but there must be clear and convincing evidence that a constructive trust is necessary to prevent unjust enrichment. *In re Estate of Eriksen*, 337 N.W.2d 671, 674 (Minn. 1983). Both CSM's unjust enrichment claim and its fraud claim fail as a matter of law. Because there is no valid fraud or unjust enrichment claim, the district court did not err in holding that CSM was not entitled to a constructive trust.

## V.

CSM argues that the district court erred in granting summary judgment on its civil conspiracy and aiding and abetting claims. In order to state a claim for aiding and abetting the tortious conduct of another, the plaintiff must show that the primary tort-feasor committed a tort that injured the plaintiff. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999). Similarly, an underlying tort is required for a civil conspiracy claim. *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. App. 1997). Despite CSM's allegation that respondents Bieber, Levy, and ATEK Companies "actively encouraged, commanded, directed, advised, and/or participated in the fraud by [Woodland] and Acrometal," no tort was committed here, as the district court properly granted summary judgment to respondents on the fraud claim. Because there is no underlying tort, the district

16

court did not err in granting summary judgment to respondents on the civil conspiracy and aiding and abetting claims.[1]

## VI.

CSM contends that the district court erred in failing to address its punitive damages claim. "Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20, subd. 1(a) (2014). This court reviews the district court's decision to deny a motion to add a claim for punitive damages for an abuse of discretion. *J.W. ex rel. B.R.W. v. 287 Intermediate Dist.*, 761 N.W.2d 896, 904 (Minn. App. 2009).

The district court declined to address CSM's motion to amend the complaint to add a claim for punitive damages because it was granting respondents' motion for summary judgment and dismissing the complaint. While CSM argues that punitive damages are appropriate because respondents "conducted a nuanced and professional fraud," CSM's fraud claim fails as a matter of law due to a lack of reasonable reliance. Therefore, the district court did not abuse its discretion by declining to address CSM's motion to amend its complaint to assert a claim for punitive damages.

## VII.

---

[1] CSM also challenges the district court's conclusion that CSM had released its claims against respondents by means of a settlement agreement between CSM and Progress. Furthermore, both CSM and respondents challenge the district court's determination of what type of damages would be recoverable if CSM were to succeed on the fraudulent inducement claim. Because we are affirming the district court's grant of summary judgment to respondents on each of CSM's claims, we need not address these issues.

17

CSM challenges the district court's award to respondents of expert witness fees, deposition costs, photocopy costs, and witness mileage and fees. Here, the district court awarded respondents a total of $141,778.66 in costs and disbursements, including $114,306 in expert witness fees, $1,892.25 in deposition costs, $1,000 in photocopying costs, $877.09 in attorney travel expenses, and $4,393.27 in witness mileage and fees.

The prevailing party in a civil matter is entitled to recover costs and reasonable disbursements. Minn. Stat. § 549.02, subd. 1 (costs), .04, subd. 1 (disbursements) (2014). This court reviews an award of costs and disbursements for an abuse of discretion. *Lake Superior Ctr. Auth. v. Hammel, Green & Abrahamson, Inc.*, 715 N.W.2d 458, 482 (Minn. App. 2006).

**Expert Witness Fees**

CSM argues that the district court erred in awarding expert witness fees because the experts did not testify and the district court did not rely on their opinions. The district court may award "just and reasonable" fees or compensation for witnesses "summoned or sworn and examined as an expert." Minn. Stat. § 357.25 (2014). It may be appropriate for a district court to award expert witness fees when a matter is disposed of by summary judgment. *See Buscher v. Montag Dev., Inc.*, 770 N.W.2d 199, 209–10 (Minn. App. 2009) (affirming the district court's award of expert witness fees even though there was no trial because "respondents were required to do investigative trial preparation in order to make dispositive motions"). Drawing upon *Buscher,* the district court noted that "it was necessary for [respondents] to retain experts to defend this matter" and that "the experts were necessary and [their costs were] reasonable to defend the claims."

18

CSM argues that *Buscher* is distinguishable because respondents' experts did not have to do any investigative trial preparation in order for respondents to make dispositive motions. This argument is not persuasive. Although respondents' experts were not deposed and did not testify, they provided appraisals, legal opinions, and evaluations of CSM's damages. As was the case in *Buscher*, denying these costs simply because the matter was resolved by summary judgment would be misplaced, as the experts were necessary to defend CSM's claims.

**Deposition Costs**

CSM next challenges the district court's award of deposition costs, arguing that they may not be awarded because respondents did not use them in connection with their motion for summary judgment. "The legal fees paid for certified copies of the depositions of witnesses . . . necessarily used on trial of a cause or on the assessment of damages, shall be allowed in the taxation of costs." Minn. Stat. § 357.31 (2014). Because the district court awarded respondents only the cost of copies of deposition transcripts used in opposition to CSM's motion for punitive damages, the district court did not abuse its discretion in awarding deposition costs.

**Photocopy Costs**

CSM also contends that the district court erred in awarding $1,000 in photocopy costs. "The cost of obtaining medical records used to prepare a claim, whether or not offered at trial, and the reasonable cost of exhibits shall be allowed in the taxation of costs."

19

Minn. Stat. § 357.315 (2014). The district court relied on this provision in awarding $1,000 in photocopying costs to respondents. But, in the statute the modifier "whether or not offered at trial" applies only to medical records, rather than to all exhibits. Because there was no trial in this case, the district court erred in awarding photocopy costs to respondents. Accordingly, we reduce the costs and disbursements awarded to respondents by $1,000.

**Witness Mileage and Fees**

CSM contends that the district court erred in awarding $4,393.27 in witness mileage and fees, alleging that witness fees "are limited to $20 per day plus mileage for attending an action for the purpose of testifying in court." But, the statute is not so limited and provides that fees may be paid for witnesses "for attending in any action or proceeding in any court or before any officer, person, or board authorized to take the examination of witnesses" and that mileage may be paid to witnesses "for travel to and from the place of attendance." Minn. Stat. § 357.22 (2014). In this case, witnesses called by respondents were deposed. Because the attendance of witnesses at depositions fits within the statute, the district court did not abuse its discretion in awarding witness fees and mileage.

**Attorney Travel Expenses**

Finally, CSM argues that the district court erred in awarding $877.09 in attorney travel expenses. The district court noted that the attorney travel expenses "were for depositions noticed by CSM and submitted for consideration with the punitive damages motion." In *Benson v. Nw. Airlines, Inc.*, this court affirmed the district court's award of attorney travel expenses incurred in taking a deposition. 561 N.W.2d 530, 541 (Minn. App.

20

1997), *review denied* (Minn. June 11, 1997). We conclude that the district court did not abuse its discretion in awarding certain attorney travel expenses.

## VIII.

In their cross-appeal, respondents challenge the district court's denial of their motion for attorney fees. After prevailing on their second motion for summary judgment, respondents moved for $813,381.51 in attorney fees. Paragraph 18.J of the purchase agreement provided that the prevailing party in any court action between Woodland and CSM would be entitled to attorney fees. However, the district court held that this clause was limited by a no-survival clause in paragraph 18.K of the purchase agreement. The district court determined that the attorney fee provision terminated upon closing because it fell within the scope of the no-survival clause. The district court concluded that the merger doctrine also prohibited respondents from recovering attorney fees. On appeal, respondents argue that neither the no-survival clause nor the merger doctrine precludes them from recovering attorney fees. We disagree.

In Minnesota, attorney fees generally are not recoverable unless a specific contract or a statute authorizes such recovery. *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 554 (Minn. 2008). Contract interpretation is a question of law that this court reviews de novo. *Valspar*, 764 N.W.2d at 364. The purpose "of contract interpretation is to ascertain and enforce the intent of the parties." *Id.* "If a contract is unambiguous, the contract language must be given its plain and ordinary meaning . . . ." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346–47 (Minn. 2003) (quotation omitted). Courts "will not rewrite, modify, or limit the effect of a contract provision by a strained construction when the contractual

21

provision is clear and unambiguous." *Dorsey & Whitney LLP v. Grossman*, 749 N.W.2d 409, 418 (Minn. App. 2008).

First, respondents argue that because the parties could anticipate a dispute arising after closing, the parties intended that the attorney fee clause would survive closing. But, in section 18, entitled "Miscellaneous," the unambiguous language of the no-survival clause, which immediately follows the attorney fee clause, specifically provides that "no warranties, covenants, or representations made herein by either [Woodland] or [CSM] shall survive [c]losing," subject to a few exceptions. In reading these two clauses together, the attorney fee clause would not survive the closing, but would apply to disputes that arose after the parties had executed the purchase agreement but before closing. If the parties wanted the attorney fee provision to apply to disputes after closing, they could have included it within the listed exceptions to the no-survival clause, but they failed to do so.

Next, respondents argue that because the attorney fee clause is not specifically described as a "covenant" under the purchase agreement, it is not subject to the no-survival clause and is a continuing promise that survives closing. But, this argument ignores the common legal definition of "covenant" as a "formal agreement or promise." *Black's Law Dictionary* 391 (8th ed. 2004). It is evident that it is this common legal usage of the word "covenant" that is utilized in the purchase agreement. For example, section 6 of the purchase agreement, entitled "Representations, Warranties and Covenants of Seller," the first clause states: "In order to induce [CSM] to enter into this [a]greement and purchase the [p]remises, [Woodland] hereby represents, warrants and covenants to [CSM] . . . ." The no-survival clause applies to all covenants or promises "[e]xcept as provided in

22

[s]ections 4, 6, and 13." Section 6 contains a provision that requires Woodland to indemnify CSM for attorney fees and court costs in the event CSM had to bring a claim or action because of Woodland's breach of any of the listed representations, warranties, or covenants. The provision, however, specifically provides that the buyer's right of indemnification only survives closing for a period of nine months. If a party's right to attorney fees as set forth in the "Miscellaneous" section, as claimed by respondents, was a continuing obligation that was exempted from the no-survival clause, there would have been no need for the section 6 exception to the no-survival clause. And, even that time-limited exception only allowed an attorney fee claim to be brought within nine months of closing by CSM, not Woodland.

Finally, respondents argue that the no-survival clause cannot apply to the attorney fee clause because the "Miscellaneous" section in which both provisions are found contains promises that were certainly intended to survive closing. Respondents point to paragraph 18.D, which provides addresses, telephone numbers, and other information for the delivery of notices and demands, and paragraph 18.L, which provides for the effectuation of a section 1031 tax deferred exchange, as clauses in the "Miscellaneous" section that must have been intended to survive closing. But, there is nothing in these clauses indicating that the parties intended these provisions to survive closing. If the parties had intended the attorney fee clause, or paragraphs 18.D and 18.L, to survive closing, they could have identified them as exceptions to the no-survival clause or included them in the deed.

The merger doctrine also precludes respondents from being awarded attorney fees. "The merger doctrine generally precludes parties from asserting their rights under a

23

purchase agreement after the deed has been executed and delivered." *Bruggeman v. Jerry's Enters., Inc.*, 591 N.W.2d 705, 708 (Minn. 1999). When the merger rule applies, "[t]he deed is conclusively presumed to express the final agreement of the parties in the absence of fraud or mistake, and any contractual provisions omitted from the deed are waived." *B-E Constr., Inc. v. Hustad Dev. Corp.*, 415 N.W.2d 330, 331 (Minn. App. 1987), *review denied* (Minn. Jan. 20, 1988). There is an exception to the merger rule for acts that are conditions subsequent to closing. *Bruggeman*, 591 N.W.2d at 710.

Respondents argue that because the attorney fee clause could be performed both before and after closing, it falls within the condition subsequent exception to the merger doctrine. But, such an interpretation improperly expands the definition of a condition subsequent. In creating the condition subsequent exception, the Minnesota Supreme Court stated that "there is no reason to presume that a party has waived its right to performance of a contractual obligation that *cannot be performed until sometime after the closing* simply by accepting a deed that does not contain a reference to that prior agreement." *Id.* (emphasis added). Accordingly, the supreme court created an exception only for those obligations that cannot be performed until after closing, not for those obligations that can be performed before or after closing. Because the attorney fee clause does not fit within the condition subsequent exception, the merger doctrine also precludes respondents from recovering attorney fees.

We conclude that, under the plain language of the purchase agreement and under the merger doctrine, there is no merit to respondents' claim that they are entitled to post-

24

closing attorney fees under the purchase agreement.  The district court did not err in refusing to award attorney fees to respondents.

In summary, we affirm the district court's grant of summary judgment to respondents on CSM's request for an accounting and constructive trust and its claims of fraudulent inducement, unjust enrichment, aiding and abetting, and civil conspiracy.  We also conclude that the district court did not err in declining to address CSM's punitive damages claim.  Because the district court abused its discretion in awarding photocopy costs to respondents, we reduce the costs and disbursements awarded to respondents by $1,000, but we affirm the remainder of the costs and disbursements award.  Finally, we hold that the district court did not err in denying respondents' motion for attorney fees.

**Affirmed as modified.**